1   GERGOSIAN & GRALEWSKI LLP
    EDWARD M. GERGOSIAN (105679)
2   ed@gergosian.com
    ROBERT J. GRALEWSKI, JR. (196410)
3   bob@gergosian.com
    655 West Broadway, Suite 1410
4   San Diego, CA  92101
    Telephone:  (619) 237-9500
5   Facsimile:   (619) 237-9555

6   BARROWAY TOPAZ KESSLER
       MELTZER & CHECK, LLP
7   D. SEAMUS KASKELA
    skaskela@btkmc.com
8   DAVID M. PROMISLOFF
    dpromisloff@btkmc.com
9   STEVEN D. RESNICK
    sresnick@btkmc.com
10  280 King of Prussia Road
    Radnor, PA 19087
11  Telephone: (610) 667-7706
    Facsimile:  (610) 667-7056
12

13  *Attorneys for Plaintiff*

14                  **UNITED STATES DISTRICT COURT**

15                  **SOUTHERN DISTRICT OF CALIFORNIA**

16  _____

17  MARILYN PATRY, Individually and On      )   Case No.: **09 CV 1000 JM     CAB**
    Behalf of All Others Similarly Situated,  )   
18                                           )   **CLASS ACTION COMPLAINT**
                             Plaintiff,       )
19                                           )   <u>JURY TRIAL DEMANDED</u>
            vs.                               )
20                                           )
    SEQUENOM, INC., HARRY STYLLI, PAUL        )
21  W. HAWRAN, ALLAN T. BOMBARD,             )
    CHARLES R. CANTOR and ELIZABETH           )
22  DRAGON,                                  )
                                             )
23                           Defendants.      )
24  _____)

25

26

27

28

                                                          CLASS ACTION COMPLAINT

1        Plaintiff, Marilyn Patry ("Plaintiff"), alleges the following based upon the investigation by

2   Plaintiff's counsel, which included, among other things, a review of the defendants' public

3   documents, conference calls and announcements made by defendants, United States Securities and

4   Exchange Commission ("SEC") filings, wire and press releases published by and regarding

5   Sequenom, Inc. ("Sequenom" or the "Company"), securities analysts' reports and advisories about

6   the Company, and information readily available on the Internet, and Plaintiff believes that substantial

7   additional evidentiary support will exist for the allegations set forth herein after a reasonable

8   opportunity for discovery.

9                      **NATURE OF THE ACTION AND OVERVIEW**

10       1.       This is a federal class action on behalf of purchasers of the securities of Sequenom,

11   who purchased or otherwise acquired Sequenom securities between June 4, 2008 and April 29, 2009,

12   inclusive (the "Class Period"), seeking to pursue remedies the Securities Exchange Act of 1934 (the

13   "Exchange Act").

14       2.       Sequenom is engaged in genetics analysis and diagnostic testing.  The Company is

15   involved in the research, development and commercialization of non-invasive molecular diagnostic

16   tests for prenatal genetic diseases and disorders, infectious diseases, oncology, and other diseases

17   and disorders.

18       3.       The Company had been developing a test known as SEQureDx, which was to be a

19   non-invasive prenatal test for Down Syndrome.  This was largely considered to be the Company's

20   "crown jewel."

21       4.       On April 29, 2009, the Company astounded its investors and the market when it

22   announced that the launch of SEQureDx would be delayed due to the discovery by Company

23   officials of employee mishandling of research and development ("R&D") test data and results.  The

24   Company announced that the Board of Directors had formed a special committee to oversee an

25   independent investigation of the employees' activity, and further stated that the Company was

26   reviewing the data for all test results, including those unrelated to SEQureDx.  As a result, the

27   Company announced that its statements made between June 4, 2008 and February 3, 2009 regarding

28   SEQureDx should no longer be relied upon.

- 1 -

5.      Following this announcement, it became apparent that the Company would be unable to launch SEQureDx in 2009, as originally planned. One analyst predicted that the launch could be delayed by up to eighteen months. Further, the Company indicated that it would wait for results from independent clinical trials before launching the test, rather than relying on its own research.

6.      Upon the release of this news, shares of the Company's stock fell an astounding $11.29 per share, or 75.72 percent, to close on April 30, 2009 at $3.62 per share, on unusually heavy trading volume.

7.      The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's business operations and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company's employees had mishandled test data and results for SEQureDx; (2) that SEQureDx failed to provide a significant improvement to existing Triple and Quad Tests; (3) that as a result, the Company would be unable to achieve a commercial launch of the test by June 2009; (4) that the Company lacked adequate internal controls; and (5) that, as a result of the foregoing, the Company's statements about its financial well-being and future business prospects were lacking in any reasonable basis when made.

8.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

11.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many

- 2 -

1  of the acts and transactions alleged herein, including the preparation and dissemination of materially

2  false and misleading information, occurred in substantial part in this Judicial District. Additionally,

3  Sequenom's principal executive offices are located within this Judicial District.

4       12.    In connection with the acts, conduct and other wrongs alleged in this Complaint,

5  defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

6  including but not limited to, the United States mails, interstate telephone communications and the

7  facilities of the national securities exchange.

8  **PARTIES**

9       13.    Plaintiff, Marilyn Patry, as set forth in the accompanying certification, incorporated

10  by reference herein, purchased Sequenom securities at artificially inflated prices during the Class

11  Period and has been damaged thereby.

12       14.    Defendant Sequenom is a Delaware corporation with its principal place of business

13  located at 3595 John Hopkins Court, San Diego, California.

14       15.    Defendant Harry Stylli ("Stylli") was, at all relevant times, the Company's President

15  and Chief Executive Officer ("CEO"), as well as a member of the Board of Directors.

16       16.    Defendant Paul W. Hawran ("Hawran") was, at all relevant times, the Company's

17  Chief Financial Officer ("CFO").

18       17.    Defendant Allan T. Bombard ("Bombard") was, at all relevant times, the Company's

19  Chief Medical Officer.

20       18.    Defendant Charles R. Cantor ("Cantor") was, at all relevant times, the Company's

21  Chief Scientific Officer and a member of the Board of Directors.

22       19.    Defendant Elizabeth Dragon ("Dragon") was, at all relevant times, the Company's

23  Senior Vice President, Research and Development.

24       20.    Defendants Stylli, Hawran, Bombard, Cantor and Dragon are collectively referred to

25  hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions

26  with the Company, possessed the power and authority to control the contents of Sequenom's reports

27  to the SEC, press releases and presentations to securities analysts, money and portfolio managers and

28  institutional investors, i.e., the market. Each defendant was provided with copies of the Company's

- 3 -

1    reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and

2    had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of

3    their positions and access to material non-public information available to them, each of these

4    defendants knew that the adverse facts specified herein had not been disclosed to, and were being

5    concealed from, the public, and that the positive representations which were being made were then

6    materially false and misleading.  The Individual Defendants are liable for the false statements

7    pleaded herein, as those statements were each "group-published" information, the result of the

8    collective actions of the Individual Defendants.

9                                    **SUBSTANTIVE ALLEGATIONS**

10                                                **Background**

11          21.    Sequenom is engaged in genetics analysis and diagnostic testing.  The Company is

12   involved in the research, development and commercialization of non-invasive molecular diagnostic

13   tests for prenatal genetic diseases and disorders, infectious diseases, oncology, and other diseases

14   and disorders.

15                                   **Materially False and Misleading**
                                     **Statements Issued During the Class Period**

16

17          22.    The Class Period begins on June 4, 2008.  On that day, the Company issued a press

     release entitled "Sequenom Announces Results of Screening Studies for Down Syndrome and
18
     Updates Development of Noninvasive Prenatal Diagnostics at Analyst and Investor Briefing."
19
     Therein, the Company stated, in relevant part:
20

21          Sequenom, Inc. (NASDAQ:SQNM), a leading provider of genetic-analysis solutions,
            announced positive results from screening studies using the Company's noninvasive
22          circulating cell-free fetal (ccff) nucleic acid SEQureDx(TM) Technology, which
            enables the detection of fetal aneuploidy, including Down syndrome from maternal
23          blood. At its analyst-and-investor briefing "The Future of Noninvasive Prenatal
            Diagnostics" held at the International Society of Prenatal Diagnostics (ISPD)
24          conference in Vancouver, Canada, executives were joined by a panel of leading
            scientists and clinicians to discuss study results and updates in the development of
25          noninvasive prenatal diagnostics.

26          *The Company reported that in blinded studies performed at Sequenom involving*
            *approximately 200 clinical samples collected both prospectively and retrospectively,*
27          *its proprietary test for Down syndrome correctly identified 100% of all Down*
            *syndrome samples (i.e. sensitivity or detection rate), without any false-positive*
28          *outcomes (i.e. specificity). Population coverage for the T21 test improved to at least*
            *93% of the U.S. population. With currently available serum-testing options having*

                                                    - 4 -

                                                                    CLASS ACTION COMPLAINT
                                                                    Case No. _____

*detection rates between 70% to 90% and false-positive rates as high as 5%, SEQureDx Technology shows promise for significant performance advantages over the current paradigms for prenatal screening.* The Company expects to continue its development activities through the end of 2008, at which time the Company will initiate transfer of the technology to laboratory partners. *The Company plans to initiate a multi-site validation study consisting of several thousand samples in the fourth quarter this year and launch its Down syndrome test as a Laboratory Developed Test (LDT) in the U.S. in the first half 2009.*

*"We are very pleased to be reporting substantial progress toward commercializing an important test to screen for Down syndrome that can be administered as early as late in the first trimester through a simple blood draw from the mother,"* said Harry Stylli, Ph.D., Sequenom's President and Chief Executive Officer. "Data from our blinded screening study for the detection of fetal aneuploidy indicate that the current version of our test has identified all Down syndrome samples without any false-positive outcomes. Also our coverage has improved to at least 93% of the U.S. population. Although these results require further validation in larger studies, such results using SEQureDxTM Technology can potentially transform current clinical practice for Down syndrome-risk assessment."

The studies conducted both prospectively and retrospectively, involved approximately 200 samples in both normal and high-risk patients. The blinded-prospective study involved 180 samples comprising 130 low-risk and 50 high-risk samples. The test correctly identified three Down syndrome samples without any false-positive outcomes. Of the 21 blinded samples analyzed retrospectively, the test correctly identified seven Down syndrome samples while also indicating no false-positive results.

"A direct, noninvasive genetic assessment of fetal Down syndrome will result in far-better screening accuracy and would dramatically reduce the number of unnecessary, invasive diagnostic procedures that women undergo in current maternal serum-screening protocols. Improved detection rates, as reported by Sequenom in its assay optimization studies, exceed those with currently available screening models," said Allan T. Bombard, M.D., a reproductive geneticist with more than two decades of experience in the field of prenatal screening and diagnosis. (Dr. Bombard serves as a Chief Medical Director at Sharp Mary Birch Hospital and is the Principal Investigator of the study.) "Moreover, having minimum false-positive results will significantly reduce the number of unnecessary confirmatory diagnostic tests, as well as the anxiety and complications associated with invasive procedures."

Currently available tests conducted during the first or second trimester of pregnancy use epigenetic markers associated with the Down syndrome phenotype that are characterized as "surrogate" markers as they are not directly related to the extra Number 21 chromosome. Different combinations of markers, measured at different times in pregnancy, constitute the multiple-marker approach to screening. These tests have detection rates of 70% to 90% with approximately a 5% false-positive rate, while also having inconsistent population coverage or ethnicity rates. *The SEQureDx test uses a maternal blood sample drawn as early as the first trimester and identifies directly the extra Number 21 chromosome.* Invasive procedures such as amniocentesis or chorionic villus sampling (CVS) carry risk of miscarriage and other risks to mother and fetus.

"Current screening methods, using multiple 'surrogate' markers, are very good, but are unlikely to reach diagnostic potential," said Jacob Canick, Ph.D., Professor of Pathology and Laboratory Medicine at Brown University Medical School. "In

- 5 -

contrast, I am optimistic that tests using multiple-fetal RNA and DNA markers can be developed not only for Down syndrome, but for all clinically important aneuploidies, and it is reasonable to expect that such direct, noninvasive diagnostics could be done in the first trimester of pregnancy." [Emphasis added.]

23.     On or about June 26, 2008, the Company conducted a secondary public offering (the "SPO" or the "Offering"). In connection with the SPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC. The SPO was a financial success for the Company, as it was able to raise over $85 million by selling 5.5 million shares of Sequenom's securities to investors at a price of $15.50 per share.  The Registration Statement stated, in relevant part:

> Our research and development efforts in molecular diagnostic products are focused on the development of non-invasive diagnostics (SEQureDx) for use on the MassARRAY system and other platforms. Initially, we are focused on providing this technology, which is non-invasive using a simple maternal blood draw, for prenatal diagnostics. Our other diagnostic tests are also planned to be non-invasive and are expected to use simple blood draws from patients rather than invasive procedures such as surgery. *We plan to initially commercialize this technology through laboratory partners in the form of Laboratory Developed Tests, or LDTs,* also known as "Home Brews," which is the predominant approach used for current tests such as serum screening and invasive prenatal tests. In addition, following acquisition or build-out, *we plan to commercialize this technology through our own CLIA (Clinical Laboratory Improvement Amendments, 1988) licensed laboratory.* Concurrent with our LDT commercialization and revenue building activities, we plan to conduct the development activities necessary to file submissions with the Food and Drug Administration, or FDA, seeking approval for selected diagnostic tests.
>
> In December 2007, through a laboratory partner we launched a LDT for Rhesus D, or RHD, genotyping. *During the third quarter of 2008, we plan to launch, through various laboratory partners, additional tests using our MassARRAY platform for* RHD genotyping and sex determination for detection of x-linked disorders.
>
> We are also developing a test for Trisomy 21 (Down syndrome). We plan to initially commercialize the test as a LDT through laboratory partners in the first half of 2009, and then through our CLIA laboratory following acquisition or build-out. We are also expecting to conduct various development efforts to provide a FDA submission seeking approval of the test in 2011. In addition to Trisomy 21, we plan to develop other chromosomal tests, including tests for Trisomy 18 (Edwards syndrome) and Trisomy 13 (Patau syndrome).
>
> *             *             *
>
> This data has been derived from our audited consolidated financial statements for the years ended December 31, 2007, 2006 and 2005, and *our unaudited consolidated financial statements for the three month periods ended March 31, 2008 and 2007, and as of March 31, 2008, all of which are incorporated by reference into this prospectus supplement.* [Emphasis added.]

24.     On September 23, 2008, the Company issued a press release entitled "Sequenom

- 6 -

1  Announces Additional, Positive Results for Down Syndrome Test at Analyst Briefing." Therein, the

2  Company, in relevant part, stated:

> *Sequenom, Inc. (NASDAQ:SQNM), a leading provider of genetic-analysis and molecular diagnostic solutions, announced additional, positive results from screening studies using the Company's noninvasive circulating cell-free fetal (ccff) nucleic acid SEQureDx(TM) Technology, which enables the detection of fetal aneuploidy, including Down syndrome from maternal blood, at its Analyst Briefing in New York City. Among the data presented, Sequenom's test demonstrated complete concordance with clinical results (no false positives and no false negatives) in both first and second trimester samples (over 200 samples announced today and in excess of 400 prospective samples to-date).* Sequenom executives were joined by a panel of leading scientists and clinicians to discuss these study results and updates in the development of noninvasive prenatal diagnostics.

> *"These data expand upon the data we announced in June and underscore the potential for our SEQureDx Technology to transform current clinical practice for prenatal diagnostics as a primary screening tool for Trisomy 21. Furthermore, these results support the potential for our test to be used in the first trimester,"* said Harry Stylli, Ph.D., Sequenom's President and Chief Executive Officer. "In addition, our announcement earlier today regarding our acquisition of the Center for Molecular Medicine, a CLIA-certified molecular diagnostics laboratory, and our partnership with Spectrum Health and the Van Andel Research Institute, provides us with important infrastructure and commercialization control. We are delighted with our progress in bringing to market an important, noninvasive screening test for Down syndrome, as well as a broader menu of molecular diagnostic tests. These results are very promising, and we look forward to continuing the clinical development and validation progress to launch in the first half of 2009.".

> Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development at Sequenom, presented data from blinded studies performed at Sequenom involving 219 new clinical samples collected prospectively, showing that its proprietary test for Down syndrome correctly identified 100% of all Down syndrome samples (i.e. sensitivity or detection rate), without any false-positive outcomes (i.e. specificity). The SEQureDx prototype test also demonstrated its ability to correctly identify a Down syndrome positive sample in the first trimester, confirmed by chorionic villus sampling (CVS), a current testing standard that requires the harvesting of placental tissue cells.

> Sequenom indicated that with the addition of new SNPs in PLAC4 and a recently discovered gene, the SEQureDx Trisomy 21 test should increase its coverage from 93% to greater than 95% in the US population. The Company has also identified novel markers for Trisomy 18 that have passed its initial selection criteria, and other chromosomes, and intends to develop these markers into new tests.

> *The Company expects to continue its current development activities through the end of 2008, at which time the Company will initiate a multi-site 3,000 to 5,000-sample laboratory developed test (LDT) validation study, which is expected to be completed and submitted for publication at the time of the anticipated commercial launch in June 2009.* To facilitate the LDT validation study, Sequenom also indicated that the company will be collaborating with new clinical partners who perform in excess of 12,000 amniocenteses and 3,000 CVS per year. In addition, Sequenom announced sponsorship of the RNA Noninvasive Aneuploidies ("RNA") study, a landmark, multi-center, prospective study involving up to 10,000 samples

CLASS ACTION COMPLAINT
Case No.: _____

from first and second trimester pregnancies using the SEQureDx technology, managed and analyzed by an independent third-party. [Emphasis added.]

25.    Also on September 23, 2008, the Company issued a press release entitled "Sequenom Announces Acquisition of CLIA-Certified Laboratory and Partnerships with Spectrum Health and Van Andel Research Institute." Therein, the Company, in relevant part, stated:

> *Sequenom (NASDAQ:SQNM) today announced that it entered into an agreement to acquire the Center for Molecular Medicine (CMM), a Clinical Laboratory Improvement Act (CLIA) certified clinical diagnostics laboratory based in Grand Rapids, Michigan.* CMM is an innovative joint venture between Spectrum Health, one of the largest not-for-profit health systems in Michigan, and the Van Andel Research Institute, an independent research institute with significant molecular biology expertise. Under the terms of the agreement, Sequenom will pay a purchase price of approximately $4.0 million (less CMM's cash at closing) to acquire CMM and will enter into collaborative agreements with Spectrum Health and the Van Andel Research Institute. *Ninety percent of the purchase price will be paid in shares of Sequenom common stock.* Sequenom also received a tax incentive package valued at up to $20 million over 12 years. The project includes a potential, near-term capital investment of approximately $10 million and the potential creation of several hundred jobs over five years.
>
> *        *        *
>
> Acquisition of the CLIA-certified lab will allow Sequenom control over all aspects of the commercialization of its SEQureDx technology, including marketing and communication programs, and critical sales and third-party payer reimbursement contracting strategies. [Emphasis added.]

26.    On October 30, 2008, the Company issued a press release entitled "Sequenom Reports 2008 Third Quarter Financial Results." Therein, the Company, in relevant part, stated:

> *"During the third quarter we rapidly advanced our paradigm-shifting approach to Down syndrome screening and reinforced our significant leadership in the noninvasive prenatal diagnostics space,"* stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Specifically, we announced complete clinical concordance with the results from our Trisomy 21 technology in more than 400 maternal blood samples analyzed to date. In addition, we secured additional intellectual property to further enhance our already significant proprietary position in noninvasive prenatal diagnostics, and we signed a definitive agreement to acquire the Center for Molecular Medicine (CMM), a state-of-the-art CLIA-certified laboratory. Upon completion of the CMM acquisition, CMM will be positioned to launch RHD and Fetal (XY) tests in the first quarter of 2009, followed by the Trisomy 21 test by mid-year. We look forward to continuing this progress in the quarter and year ahead."
>
> *        *        *
>
> 2008 Third Quarter and Recent Highlights
>
> • *Further Positive Results from Down Syndrome Screening Study: In late September Sequenom announced additional positive results from screening*

- 8 -

CLASS ACTION COMPLAINT
Case No. _____

1  *studies for detection of fetal aneuploidy, including Down syndrome, from*
   *maternal blood using Sequenom's noninvasive circulating cell-free fetal*
2  *(ccff) nucleic acid SEQureDx Technology.* At the Analyst and Investor
   Briefing, Sequenom presented data demonstrating complete concordance
3  with clinical results (no false positives and no false negatives) in both first
   and second trimester samples from an additional 200 (400 in total)
4  prospective samples. [Emphasis added.]

5      27.    On December 1, 2008, the Company issued a press release entitled "Next-Generation

6  Noninvasive Diagnostic Technology Shown to Accurately Detect Fetal Down Syndrome in First

7  Trimester of Pregnancy."  Therein, the Company, in relevant part, stated:

8  *Sequenom, Inc. (NASDAQ:SQNM)* announced new data from a collaborative
   *project with The Chinese University of Hong Kong, published this week in the*
9  *Early Edition of the Proceedings of the National Academy of Sciences, that*
   *demonstrate its innovative, next-generation, noninvasive prenatal diagnostic*
10 *technology accurately quantified maternal plasma DNA sequences for fetal*
   *Trisomy 21, or Down syndrome, based on samples taken from women in the first*
11 *and second trimesters of pregnancy. These data are the first to suggest that this*
   *future approach, based on massively parallel genomic DNA sequencing, can be*
12 *effective in women who had not previously undergone invasive procedures.*

13 This study used massively parallel genomic sequencing to quantify maternal plasma
   DNA sequences for the noninvasive prenatal detection of Down syndrome, assessing
14 samples from 28 women in the first and second trimesters of pregnancy. All 14
   Down syndrome fetuses and normal fetuses were correctly identified at these early
15 stages.

16 "Current invasive methods for diagnosing Down syndrome in pregnancy have
   documented risks associated with such procedures. *Our new study using massively*
17 *parallel genomic DNA sequencing represents a 'next-generation' technology for*
   *noninvasive, safe testing of Down syndrome. This is the first study to show that this*
18 *approach can be used for the detection of Down syndrome in both the first and*
   *second trimesters, based on a rigorously controlled clinical cohort in which the*
19 *pregnant women with fetuses affected by Trisomy 21 and those with normal fetuses*
   *were matched in gestational age,* and in which most of the studied subjects had not
20 previously undergone an invasive procedure. The latter point is important as it shows
   that the method would truly work in the noninvasive prenatal diagnostic scenario.
21 This study also employs a novel data analysis algorithm which has achieved an
   unprecedented clear separation of the Trisomy and normal samples," stated Dennis
22 Lo, M.D., Ph.D., co-author of the study, and Li Ka Shing, Professor of Medicine at
   The Chinese University of Hong Kong. "While this new approach is several years
23 away as a commercially viable test, we believe that massively parallel genomic
   sequencing of DNA in maternal plasma may offer a complementary approach to the
24 RNA SNP allelic ratio approach that we reported last year for Trisomy 21 detection.
   The two approaches have performance and cost profiles which would potentially be
25 synergistic to one another."

26                      *       *       *

27 "Screening tests currently available for early detection of Down syndrome and other
   chromosomal disorders are associated with a relatively high rate of inaccuracy,
28 which can result in an overlooked abnormality or, in the case of false positive results,

CLASS ACTION COMPLAINT
Case No. _____

unnecessary invasive and risky procedures," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Systems to support DNA sequencing like massively parallel genomic sequencing or shotgun sequencing are currently limited to the academic setting due to scalability limitations and high cost, therefore practical applications are several years from commercialization. We find the data reported by Dr. Lo and associates to be very compelling and, while we continue to evaluate other promising approaches, Sequenom licensed this technology several months ago because we believe massively parallel genomic sequencing is a promising approach to prenatal diagnostics that may offer a future extension to our SEQureDx(TM) prenatal diagnostics franchise. Even though this technology is years away from the clinic, *we expect that our current RNA SNP allelic ratio technology - which is the basis for the Down syndrome test we expect to launch in June 2009 - will represent a major step forward in maternal and fetal testing."*

Current screening technology for Down syndrome includes serum marker analysis, such as the quad screen and first trimester combined screening that employs both serum marker testing and nuchal translucency. *These approaches have detection or sensitivity rates of 80% and 85% respectively, which means between 15% and 20% of all Down syndrome-affected pregnancies will not be identified as needing further evaluation. In addition, these approaches also have false positive rates between 5% and 10%, resulting in hundreds of thousands of unnecessary, highly invasive CVS or amniocentesis procedures.* These invasive procedures, which are used to determine whether the fetus has Down syndrome, carry a risk of miscarriage in the range of one-in-100 to one-in-300. [Emphasis added.]

28.     On January 14, 2009, the Company issued a press release entitled "Sequenom to Commence Exchange Offer to Acquire EXACT Sciences." Therein, the Company, in relevant part, stated:

Sequenom, Inc. (NASDAQ:SQNM) announced that it intends to make an exchange offer to acquire all of the outstanding shares of common stock of EXACT Sciences Corporation (NASDAQ:EXAS) in an all-stock transaction valued at approximately $41 million. Under the terms of the proposal, each share of EXACT Sciences would be exchanged for $1.50 in Sequenom common stock. This consideration would be subject to a floating exchange rate within a 15% collar, in which the price of Sequenom's common stock is between $20.74 and $28.06 per share. The acquisition of EXACT Sciences, a pioneer in noninvasive stool-based DNA screening technologies for colorectal cancer, would provide Sequenom with an expanded noninvasive diagnostics offering in oncology, and position Sequenom with one of the most comprehensive noninvasive cancer diagnostic portfolios. The complete terms and conditions of the offer will be filed with the U.S. Securities and Exchange Commission.

29.     On January 28, 2009, the Company issued a press release entitled "Sequenom Center for Molecular Medicine Collaborates with Obstetrix Medical Group to Provide Clinical Samples for LDT Validation Study." Therein, the Company, in relevant part, stated:

- 10 -

*Sequenom, Inc. (NASDAQ:SQNM), today announced a collaboration with Obstetrix Medical Group, to provide the Sequenom Center for Molecular Medicine (SCMM) with samples for a study to further evaluate its novel, noninvasive prenatal test to assess Down syndrome (Trisomy 21) based on its circulating cell-free fetal (ccff) nucleic acid SEQureDx™ technology.* Obstetrix is a national physician group practice of maternal-fetal medicine specialists that is affiliated with Pediatrix Medical Group.

This prospective multi-center feasibility study, "Noninvasive Screening for Fetal Aneuploidy: A New Maternal Plasma Marker," is designed as a Laboratory Developed Test (LDT) validation study and will evaluate up to 5,000 samples. To facilitate the LDT validation of the SEQureDx Trisomy 21 Test, Sequenom will be collaborating with physicians practicing as part of Obstetrix as well as other maternal-fetal medicine practices. According to the study protocol, Obstetrix will collect clinical maternal plasma samples prior to performing an amniocentesis or chorionic villus sampling (CVS) procedure. SCMM will then compare results for the detection of Down syndrome using its prototype test of maternal blood samples to the related amniocentesis or CVS results.

"We are delighted to be working with Obstetrix, a highly respected leader in the care of women during high-risk pregnancies," said Harry Stylli, Ph.D., Sequenom's President and Chief Executive Officer. *"This validation study is an important next step in our commercialization strategy to bring our noninvasive Trisomy 21 Down syndrome maternal blood LDT to market."*

Thomas J. Garite, M.D., of Obstetrix Medical Group, who will oversee the study, stated, "The discovery of fetal DNA and RNA in the plasma of pregnant women has led to promising approaches to noninvasive prenatal testing for the identification of pregnancies with a chromosomal abnormality such as Down syndrome. This test could produce results that are more accurate than current early-stage serum screening methods, thus reducing the need for invasive tests, such as amniocentesis or CVS, which pose a certain level of risk for mother and fetus."

Dr. Stylli added, *"We are committed to becoming a leader in noninvasive prenatal diagnostics. As such, Sequenom has taken a three-pronged approach to the development and clinical evaluation of the Trisomy 21 technology. First, we completed a rigorous R&D study over the last year, the final data from which will be announced later today. Second, we initiated this LDT validation study to obtain extensive clinical data in support of faster adoption of an LDT by our CLIA-certified laboratory, SCMM. Lastly, Sequenom is sponsoring the RNA Noninvasive Aneuploidies ("RNA") study, a landmark, multi-center, prospective study involving up to 10,000 samples from first and second trimester pregnancies using the SEQureDx technology, managed and analyzed by an independent third-party."* [Emphasis added.]

30.     Also on January 28, 2009, the Company issued a press release entitled "Sequenom Announces New Positive Data on Down Syndrome Detection and Unveils Breakthrough DNA

- 11 -

1  Approach to Prenatal Diagnostics." Therein, the Company, in relevant part, stated:

2  *Sequenom, Inc. (NASDAQ:SQNM) today announced new positive*
   *data from the prospective clinical studies using the Company's*
3  *noninvasive SEQureDx™ technology, enabling the detection of*
   *fetal aneuploidy from maternal blood. The data presented today*
4  *consist of 459 new, high prevalence samples from the prospective,*
   *blinded studies performed at Sequenom, bringing the total number*
5  *of samples studied to 858. Based on the results from the total study*
   *samples, including samples as early as 8 weeks of pregnancy, the*
6  *Sequenom SEQureDx RNA-based technology demonstrated a 100%*
   *positive predictive value (PPV) and a 99.9% negative predictive*
7  *value (NPV). The SEQureDx technology achieved a better than*
   *99% detection rate, with less than a 1% false positive rate.* The
8  current standard of care, screening tests, perform at less than a 99%
   detection rate; however, statistically, if these screening tests could
9  perform at a 99% detection rate, their false positive rate would be in
   the 10% to 25% range. SEQureDx compares favorably to the current
10 invasive procedures, such as amniocentesis.

11 *In addition to data on the RNA-based technology, the Company*
   *unveiled a breakthrough technology which further enhances*
12 *Sequenom's SEQureDx technology. This new DNA approach has*
   *demonstrated in early studies universal ethnic coverage, high*
13 *sensitivity and specificity, and the ability to detect Trisomy 21*
   *(Down syndrome), Trisomy 18 (Edwards syndrome) and Trisomy 13*
14 *(Patau syndrome) in a single test.* This technology is being
   developed as a "reflex test" for unresolved results from the current
15 SEQureDx Trisomy 21 technology will be available at the time of the
   launch of the Trisomy 21 laboratory developed test (LDT) in June
16 2009.

17 "We are very pleased with the completion of the R&D studies for our
   Trisomy 21 RNA-based technology," stated Harry Stylli, Ph.D.,
18 President and Chief Executive Officer of Sequenom. "Our highly
   sensitive and specific Down syndrome technology will be transferred
19 to the Sequenom Center for Molecular Medicine (SCMM) to
   complete the development and validation phases necessary for launch
20 in June as an LDT. Our pioneering DNA approach is proving to be a
   powerful approach to detecting a wide range of aneuploidies. We are
21 very excited by these early findings and believe it will play a key role
   in our prenatal diagnostics franchise as it eliminates unresolved
22 results due to ethnic coverage and has shown sensitivity as early as
   eight weeks, similar to the current RNA approach. Furthermore, we
23 believe it will have broad applicability in other areas such as cancer
   aneuploidies and other genetic disorders. This new approach and
24 other approaches being developed by the Company are covered by
   existing and recently filed patents."

25 **Overview of Data from Screening Studies Evaluating RNA-based**
26 **Trisomy 21 Technology**

27 Elizabeth Dragon, Ph.D., Senior Vice President of Research and
   Development at Sequenom, presented data from blinded studies
28 performed at Sequenom involving 459 new, high prevalence clinical

- 12 -

samples collected prospectively, which brings the total number of samples studied to 858. *The data from the 459 new samples show that Sequenom's proprietary technology for Down syndrome correctly identified all eight first trimester Down syndrome samples (i.e. sensitivity or detection rate) with no false positives and no false negatives, as confirmed by chorionic villus sampling (CVS).* Of the 15 second trimester confirmed Down syndrome samples, the Sequenom RNA-based technology detected 14 samples, with one unresolved result reflexed to the new DNA-based method. The DNA-based method accurately detected the Down syndrome. There was one false positive in the second trimester samples, which would be reflexed for confirmatory genetic testing per American College of Obstetricians and Gynecologists (ACOG) guidelines.

*"These results represent a significant advance in noninvasive prenatal screening," stated Allan T. Bombard, M.D., Chief Medical Officer of Sequenom. "In light of these outstanding results, the SEQureDx RNA-based Trisomy 21 technology clearly represents a paradigm-shifting approach. I am encouraged by the single false-positive result in this study representing one tenth of one percent of the total samples tested to-date, and the detection rate is notably superior to the current standard of care, biochemical screening tests.* As an ob-gyn, I am confident the simplicity of the SEQureDx approach will be invaluable to physicians and the patients they care for and will result in substantially fewer invasive procedures."

**Breakthrough DNA Approach to Detection of Trisomy 21 and Other Aneuploidies**

In addition, Dennis Lo, M.D. Ph.D., Li Ka Shing Professor of Medicine at The Chinese University of Hong Kong, presented insights in future opportunities for noninvasive prenatal diagnostics, including pioneering work in a novel DNA approach to the detection of fetal aneuploidy, an approach which Sequenom is already evaluating in R&D studies.

Dr. Dragon from Sequenom presented early findings regarding this promising technology from 359 samples. These findings showed that the DNA-based method correctly identified all 68 unresolved results reflexed from the RNA method, including one confirmed positive Trisomy 21 sample. In addition, this method correctly identified four confirmed positive Trisomy 13 samples and four confirmed positive Trisomy 18 samples.

"We believe this technology represents a breakthrough approach for detecting chromosomal aneuploidies," stated Dr. Dragon. "This method provides a universal method for detecting all chromosomal aneuploidies. The simple integration into RNA lab workflow of this MassARRAY-based technology does not impact timelines or costs. We will continue to evaluate this technology in parallel to the RNA method and plan to incorporate the DNA-based method into our launch plans."

- 13 -

1                                    *      *      *

2          "Sequenom is committed to developing the next generation of
           prenatal diagnostic tools that will provide physicians with the
3          capabilities they need to noninvasively diagnose genetic disorders
           early in a woman's pregnancy," commented Dr. Stylli. "We believe
4          these unique, noninvasive digital technologies have the potential to
           dramatically impact the prenatal diagnostic market and we look
5          forward to advancing these innovative approaches as part of our
           long-term strategy to expand our prenatal diagnostics franchise."
6          [Emphasis added.]

7          31.    On February 3, 2009, the Company issued a press release entitled "Sequenom

8  Announces Findings on Methylation Markers and RNA-SNP Markers as Presented at SMFM."

9  Therein, the Company, in relevant part, stated:

10         Sequenom, Inc. (NASDAQ: SQNM) today announced new data showing the
           discovery of DNA methylation markers for Trisomy 21 (Down syndrome), Trisomy
11         18 (Edwards syndrome) and Trisomy 13 (Patau syndrome) and identification of
           chromosome RNA-SNP markers for early detection of Trisomies 18 and 13. The data
12         were presented on Thursday and Friday, January 29 and January 30, 2009, at the 29th
           annual meeting of the Society for Maternal-Fetal Medicine (SMFM). In addition,
13         Sequenom announced more information regarding the performance of its Down
           syndrome test at a separate meeting held concurrently in San Diego.
14
15         "Sequenom is committed to reinforcing its leadership in the noninvasive prenatal
           arena with innovative, proprietary technologies for chromosomal disorders, and
16         monogenic, polygenic diseases using discrete and whole genome approaches," said
           Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Our
17         discoveries regarding new DNA methylation and RNA-SNP markers for Trisomies
           21, 18, 13 will help expand our future assay offerings. Also, our new, proprietary
18         DNA-based testing method, which was presented at our analyst meeting,
           complements our RNA-based strategy, especially as a reflex for homozygote no
19         calls. The DNA-based method has the potential to work universally for T21, T18,
           T13 and gender determination in a single tube."
20
21                                   *      *      *

22
23         In a poster session at the SMFM meeting entitled "Identification of RNA-SNP
           Markers for Noninvasive Prenatal Diagnosis (NIPD) of T18 and T13," an exon array
24         was utilized to compare gene expression profiles and identify SNPs using matched
           placenta and maternal PBMC RNA samples. All SNP candidates were then screened
25         using 100 human diversity genomic DNA samples of various ethnicities to measure
           the heterozygote rate (HR) for each SNP. SNPs with an HR of 4 percent or greater
26         were retested using placental RNA samples. Four SNPs from one C13 gene and three
           C18 genes were selected for assay development based on positive placental RNA
27         results and additional SNPs within these genes will be validated to expand population
           coverage for T13 and T18 screening using the RNA-based method.
28

                                        - 14 -

*The RNA, DNA and methylation marker variations of the SEQureDx™ Technology are being developed in parallel and may be validated in the same studies. All may ultimately be commercialized and prove complementary in some or all patients.*

**Additional Data from Screening Studies Evaluating RNA-based SEQureDx Trisomy 21 Technology**

*During an analyst and investor briefing held concurrently with the SMFM meeting, Sequenom presented new data evaluating its prenatal screening technology for Down syndrome. The data presented consisted of 459 new samples from prospective, blinded studies performed at Sequenom, bringing the total number of samples studied to 858. The test correctly identified all 22 T21 positive samples from the 459 new samples including eight first-trimester and 14 second-trimester Down syndrome samples (i.e. 100% sensitivity or detection rate) with one false positive and no false negatives, as confirmed by chorionic villus sampling (CVS) and amniocentesis.* The DNA-based method correctly detected the one homozygous sample that the RNA-based method did not resolve (i.e., that had been deemed a "no-call").

A summary of the results for the 459 new samples including samples as early as 8 weeks of pregnancy are as follows:

Specificity of 99.7% (98.4% - 100%) and 100% sensitivity (85.1 – 100%) at a 95 % confidence interval;

*The Positive Predictive Value is 95.6% (79.0% -99.8%) and the Negative Predictive Value of 100.0% (98.9% - 100%) at a 95% confidence interval;*

The SEQureDx RNA test had a total of 85 unresolved results ("no-calls") due to homozygotes (80) and unacceptably low RNA levels (5) for a total of 18.5%. The DNA-based method analyzed 68 of the homozygote "no-calls" and all were successfully resolved;

\*     \*     \*

*"We are pleased with the progress of our research efforts and look forward to transferring the technology to our CLIA facility soon for commercial launch in June,"* said Dr. Betty Dragon, Senior Vice President Research & Development. "We are confident that our no call rate for homozygote samples will improve as the patient population increases and the ethnic distribution normalizes.

\*     \*     \*

Based on the results from the 858 total study samples, the Sequenom SEQureDx RNA-based technology demonstrated:

- 15 -

Specificity of 99.9% (99.2% - 100.0%) and 100% sensitivity (87.9% - 100.0%) at a 95% confidence interval;

*The Positive Predictive Value is 96.6% (82.8% -99.8%) and the Negative Predictive Value of 100.0% (99.5% - 100%) at a 95% confidence interval;*

The SEQureDx RNA test had a total of 106 unresolved results ("no calls") due to homozygotes (94) and unacceptable RNA levels (12) or a total of 12.4%. The DNA-based method, when applied, resolved all no calls;

*SEQureDx is considerably more accurate than commonly employed standard-of-care screening tests, which perform at a 70%-90% detection rate (i.e., sensitivity) with a 90%-95% specificity in practice. SEQureDx even compares favorably to current invasive procedures, such as amniocentesis (which has sensitivity and specificity of approximately 99.5%).* [Emphasis added.]

32.     On February 11, 2009, the Company issued a press release entitled "Sequenom Reports Fourth Quarter Financial Results." Therein, the Company, in relevant part, stated:

Sequenom, Inc. (NASDAQ: SQNM) today reported financial results for the three and 12 months ended December 31, 2008.

*"This past year was pivotal for Sequenom as we continued to advance our genetic analysis and molecular diagnostics businesses," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "We accomplished many key milestones over the last 12 months and are well-positioned for the launch of our SEQureDx™ Down syndrome technology in June. The data reported from our R&D study containing 858-patient samples clearly shows that our SEQureDx screening technology is considerably more accurate than the current standard-of-care screening technology, and even compares favorably against current invasive procedures.* We intend to review in extensive detail the specifics of our promising study results and commercialization milestones by dedicating substantial time to these during our quarterly investment-community conference call later today."

\*          \*          \*

**Early 2009 Highlights**

*Announced Additional Positive Results from RNA Down Syndrome Screening Study and Unveiled Breakthrough DNA Approach to Prenatal Diagnostics: Earlier this year, Sequenom announced positive data regarding the performance of its Down syndrome test, including data from 459 new, high-prevalence patient samples, bringing the total number of patient samples studied to 858. Based on the results from total study samples, including samples obtained as early as eight weeks of pregnancy, Sequenom's SEQureDx RNA-based technology demonstrated a 96.6% positive predictive value (PPV) and a 100% negative predictive value (NPV).* Sequenom also unveiled a breakthrough DNA-based SEQureDx technology demonstrating, in early studies, universal ethnic coverage, high sensitivity and specificity, and the ability to detect Trisomy 21 (Down syndrome), Trisomy 18 (Edwards syndrome) and Trisomy 13 (Patau syndrome) in a single test.

- 16 -

1                \*     \*     \*

2      **Fourth Quarter 2008 Highlights**

3      New Data Indicates Next-generation Noninvasive Technology Accurately Quantifies Maternal Plasma DNA Sequences for Down syndrome: In December Sequenom announced new data from a collaborative project with The Chinese University of Hong Kong, published in the Early Edition of the Proceedings of the National Academy of Sciences, that demonstrate Sequenom's innovative, next-generation, noninvasive prenatal diagnostic technology accurately quantified maternal plasma DNA sequences for Down syndrome, based on samples taken from women in the first and second trimesters of pregnancy. These data are the first to suggest that this future approach, based on massively parallel genomic DNA sequencing, can be effective in women who had not previously undergone invasive procedures. [Emphasis added.]

9      33.      On March 12, 2009, Sequenom filed its Annual Report with the SEC on Form 10-K.

10 The Company's Form 10-K was signed by Defendants Stylli, Hawran and Cantor, and stated, in

11 relevant part:

12      *In the near term, we are targeting a $2 billion prenatal screening opportunity with our prenatal Down syndrome and Rhesus D genotyping products. Cystic fibrosis carrier screening, which is often ordered when Down syndrome screening is performed is estimated to be a market worth an additional $250 to $750 million based on the different product offerings available in the United States today.*

15                \*     \*     \*

16      Based on the results from the 858 total study samples, our SEQureDx RNA-based technology demonstrated:

18      • *Specificity of 99.9% (99.2%–100.0%) and 100% sensitivity (87.9%–100.0%) at a 95% confidence interval;*

19      • *The Positive Predictive Value is 96.6% (82.8%–99.8%) and the Negative Predictive Value of 100.0% (99.5%–100%) at a 95% confidence interval;*

21      • The SEQureDx RNA test had a total of 106 unresolved results ("inconclusives") due to homozygotes (94) and unacceptable RNA levels (12) or a total of 12.4%. (The DNA-based method, when applied, resolved the no calls of those samples which could be tested );

23      • *SEQureDx is more accurate than commonly employed standard-of-care screening tests, which perform at a 70%-90% detection rate (i.e., sensitivity) with a 90%-95% specificity in practice. SEQureDx even compares favorably to current invasive procedures, such as amniocentesis (which has sensitivity and specificity of approximately 99.5%).*

26      "Specificity" is the probability that the test will be negative if the patient does not have the disease or condition. "Sensitivity" is the probability that the test will be positive if the patient has the disease or condition. "Positive Predictive Value" is the probability that a patient has the disease or condition when his/her test is positive. "Negative Predictive Value" is the probability that a patient does not have the disease

1    or condition when his/her test is negative. The ranges in parentheses are 95%
confidence intervals which represent the statistical uncertainty associated with the
2    results based on the sample data. [Emphasis added.]

3    34.    The Company's March 12, 2009 Form 10-K also contained certifications signed by

4    Defendants Stylli and Hawran, which stated, in relevant part:

5    I, [Harry Stylli/Paul Hawran], certify that:

6    1. I have reviewed this annual report on Form 10-K for the year ended December 31,
2008 of Sequenom, Inc.;
7

8    2. Based on my knowledge, this annual report does not contain any untrue statement
of a material fact or omit to state a material fact necessary to make the statements
made, in light of the circumstances under which such statements were made, not
9    misleading with respect to the period covered by this annual report;

10    3. Based on my knowledge, the financial statements, and other financial information
included in this annual report, fairly present in all material respects the financial
11    condition, results of operations and cash flows of the registrant as of, and for, the
periods presented in this annual report;
12

13    4. The registrant's other certifying officer(s) and I am responsible for establishing
and maintaining disclosure controls and procedures (as defined in Exchange Act
Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as
14    defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

15        a) designed such disclosure controls and procedures, or caused such
disclosure controls and procedures to be designed under our supervision, to
16        ensure that material information relating to the registrant, including its
consolidated subsidiaries, is made known to us by others within those
17        entities, particularly during the period in which this annual report is being
prepared;
18

19        b) designed such internal control over financial reporting, or caused such
internal control over financial reporting to be designed under our supervision,
20        to provide reasonable assurance regarding the reliability of financial
reporting and the preparation of financial statements for external purposes in
accordance with generally accepted accounting principles;
21

22        c) evaluated the effectiveness of the registrant's disclosure controls and
procedures and presented in this annual report our conclusions about the
effectiveness of the disclosure controls and procedures, as of the end of the
23        period covered by this annual report based on such evaluation; and

24        d) disclosed in this annual report any change in the registrant's internal
control over financial reporting that occurred during the registrant's most
25        recent fiscal quarter (the registrant's fourth fiscal quarter in the case of this
annual report) that has materially affected, or is reasonably likely to
26        materially affect, the registrant's internal control over financial reporting; and

27    5. The registrant's other certifying officer(s) and I have disclosed, based on our most
recent evaluation of internal control over financial reporting, to the registrant's
28

- 18 -

1   auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

2

3       a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

4

5       b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

6

7   35.    The statements contained in ¶¶ 22-24, 26-27 and 29-34 were materially false and

8   misleading when made because Defendants failed to disclose or indicate the following: (1) that the

9   Company's employees had mishandled test data and results for SEQureDx; (2) that SEQureDx failed

10  to provide a significant improvement to existing Triple and Quad Tests; (3) that as a result, the

11  Company would be unable to achieve a commercial launch of the test by June 2009; (4) that the

12  Company lacked adequate internal controls; and (5) that, as a result of the foregoing, the Company's

13  statements about its financial well-being and future business prospects were lacking in any

14  reasonable basis when made.

15  **The Truth Begins to Emerge**

16  36.    On April 29, 2009, the Sequenom issued a press release entitled "Sequenom

17  Announces Delay in Launch of SEQureDx Trisomy 21 Test." Therein, the Company, in relevant

18  part, revealed:

19  *SEQUENOM, Inc. (NASDAQ: SQNM) announced today that the expected launch of its SEQureDx™ Down syndrome test is delayed, due to the discovery by*

20  *company officials of employee mishandling of R&D test data and results. Accordingly the company is no longer relying on the previously announced R&D*

21  *test data and results.* SEQUENOM has not changed its plans to develop in parallel its RNA- and DNA-based methods for the Down syndrome test and will endeavor to

22  have a validated test in the fourth quarter of 2009. Under the circumstances, and as supported by key clinical opinion leaders, *the company now intends to launch the*

23  *Down syndrome test upon publication in a peer-reviewed journal of the results from the on-going large, independent clinical studies, which are designed to be*

24  *practice-changing for Down syndrome testing.*

25  *The company's board of directors has formed a special committee of independent directors to oversee an independent investigation of the employees' activity related*

26  *to the test data and results.* The committee has engaged independent counsel to assist the committee in the conduct of the investigation.

27

28  Although the company is not aware of any potentially inappropriate activity related to the reported results of its other tests under development, *the company is currently*

- 19 -

1  *reviewing the data for all tests. As a result of this ongoing review the Rhesus D,*
   *Cystic Fibrosis and Fetalxy tests are now anticipated to begin launching in the*
2  *third quarter of this year.*

3  *The company believes that its Down syndrome program has suffered a temporary*
   *setback* but that the SEQureDx technology is scientifically and technically sound.
4  The company intends to take every possible action to make up lost ground.
   SEQUENOM believes that it has the financial resources to commercialize its test for
5  Down syndrome and other prenatal disorders.

6  *Today's announcement regarding the company's SEQureDx Down syndrome*
   *R&D test data and results supersedes all previous announcements about such data*
7  *and test, including its press releases dated June 4, 2008, September 23, 2008,*
   *December 1, 2008, January 28, 2009 and February 3, 2009.* [Emphasis added.]
8
9      37.    Also on April 29, 2009, after the close of the market, the Company held an earnings

conference call with analysts and investors.  During the call, Defendant Stylli stated, in pertinent
10
part:
11
      [Stylli]: As you all are aware, we have accelerated the timing of our earnings call in
12    order to give you information on a number of issues that have come to light which
      will have a significant bearing on the timing of the launch of our Down's Syndrome
13    assay.

14    *As a result of internal inquiries, we have determined that the R&D study data*
      *associated with the Down's Syndrome assay was mishandled by individuals in our*
15    *Company. This raises significant concerns regarding the integrity of that data.* I
      am enormously disappointed to discover this could happen here and I'm even more
16    disappointed that it would delay such a promising technology that is based on what
      we still believe to be solid and truly breakthrough science.
17
      To say we're taking this situation seriously would be a massive understatement. The
18    Board and I have taken several steps at this point. *We have suspended four*
      *individuals and have put a new team in place to oversee the R&D studies for our*
19    *prenatal diagnostics. The Board has convened a special committee of independent*
      *directors to oversee an investigation.* The committee will oversee that effort and
20    have selected Bob Rose to conduct the probe. He is a partner in the Law Firm of
      Sheppard Mullin Richter & Hampton where he currently specializes in civil fraud.
21    Bob's experience includes 12 years as a federal prosecutor specializing in fraud
      investigations.
22
      *We have alerted the SEC and we will keep them apprised of our actions. We have*
23    *also informed the FDA and will continue to follow any recommendations they may*
      *have for us.* I want to be very clear about this. We will take whatever additional
24    actions that are necessary to protect confidence in this Company, our research, and
      our products. The Company has suffered a temporary setback to its plans. Let me
25    reiterate that we are fully determined to bring our Down's Syndrome assay to market
      expeditiously. Ideally, Sequenom plans to continue to develop both the RNA and
26    DNA methods in parallel and also plans to have a validated Down's Syndrome test in
      the fourth quarter of 2009.
27
      Under the circumstances and as supported by our key clinical opinion leaders, *the*
28    *Company now intends to launch the Down's Syndrome test upon publication in a*

                                          - 20 -

*peer review journal of the results from the ongoing large independent clinical studies which are designed to be practice changing for Down's Syndrome testing.* The Company believes it is adequately capitalized to develop and launch its menu of non-invasive prenatal tests. We look forward to improving prenatal care through our innovative, non-invasive prenatal tests, based on our proprietary technology.

*       *       *

[Analyst]: Harry, three questions. One is what evidence do you have that the diagnostic test is validated at all? The second is, can you define a little more specifically what internal inquiries actually meant? How did you go about an internal series of questions and why did you do it? And the third question, please just review for us the large independent study that you're referring to, where you are in that process, how many patients, et cetera, do you anticipate again the timing? Thanks very much.

[Stylli]: Tony, thank you for the questions. *Because of confidentiality considerations and because the investigation is not complete, I am limited as to what I can say.*

*       *       *

[Analyst]: I had a question regarding really when you started to suspect or become concerned about the validation of the test. Can you give us more color on that and whether or not it was related to the presentation of data in January?

[Stylli]: *What I would say is that the data in question relates to data that goes back to June. The September and January releases of information, I believe that information is now suspect.* And again, I'm going to sort of repeat this. I can't really go into any of the details because of the confidentiality considerations of the investigation is not complete. That really ties my hands.

[Analyst]: Harry, I understand that but could you provide us any color on not necessarily the individuals of involved but the types of functions that they performed?

[Stylli]: *They were all folks in the R&D organization.*

*       *       *

[Analyst]: And then finally, sorry to dog this, can you give me a sense as to whether or not this was data, data analysis, or sample handling or presentation of the data that was                                 a                                 concern?

[Stylli]: *Again, I would like to provide more color but because this — I hate to be saying this all the time but there are certain things I just can't talk about because this is still a live investigation. What I will say that it really relates to the announced R&D test data and results. That's about the only thing I can say. I can't give you any more color beyond that.*

[Analyst]: And then do you expect to provide an update once you complete the investigation   and   is   that   measured   in   days,   weeks,   months?

[Stylli]: Again, I do not have a specific time range in mind. That's really down to the

- 21 -

independent investigator. So, I can't really give you a timeframe. But I would anticipate that we would provide more color in due course.

                              *        *        *

[Analyst]: What evidence do you have that we have something that is accurate? Do you have anything when you examine the compromised data set? I'm sure you want to know personally. Why would you - ? What evidence do you have that you should continually invest in this program? This is a difficult question. But I think you should understand that if we can get any comfort level, if we only have theoretical evidence that this test is promising then people will not continue to believe in it until you show evidence to the contrary.

[Stylli]: Thank you, Elemer. That's a very pointed question. *I've got to answer the first part, in discussing any evidence, I cannot, because I need to respect the Board committee's authority and their choice is to conduct an independent investigation.* I will add this. The science is extremely solid. The assays show the potential and we believe both the RNA and DNA assay is going to fulfill their potential. We've got some very high powered teams working on this currently. There's more than optimism that these tests will see the light of day as noninvasive prenatal diagnostics.

[Analyst]: You used the term "belief", Harry. We are dealing with science. Would you at least -- let me move on to another different part. Do you think that the integrity of your announcement, vis-a-vis both the RNA and DNA tests are in jeopardy?

[Stylli]: *I would say the data that was presented is questionable.* I want to make the distinction, the clinical performance that was portrayed for these tests appears to be questionable.

                              *        *        *

[Analyst]: Just to be clear, Harry, the compromised data includes the June '08, September '08, January '09 RNA plus the January '09 DNA?

[Stylli]: *Yes. I mean, today's announcement regarding the test results, the test data and results, I think we said this in the press release, two procedural previous announcements about the data. That includes the data from June 4, 2008, September 23, 2008. I've got a few other dates there as well. December 1, 2008, January 28, 2009, and February 3, 2009.*

                              *        *        *

[Analyst]: My question surrounded similar questions from before. You really didn't answer them but I -- most of the data, would you say -- you used the word "mishandled". Would you say that "falsified" is too strong a word? Were there mistakes made scientifically on the assay part of it? Or do you think data was falsified on purpose? What exactly do you think happened?

[Stylli]: *I would like to answer those questions, but again, I've got to respect the other committee until it concludes its analysis.* [Emphasis added.]

38.     On this news, shares of the Company's stock fell $11.29 per share, or 75.72 percent, to close on April 30, 2009 at $3.62 per share, on unusually heavy trading volume.

- 22 -

39.     On April 30, 2009, the Associated Press published an article entitled "Sequenom Shares Plummet After Delay of Downs Test."  The article, in relevant part, stated:

> *Shares of Sequenom Inc. crashed in trading Thursday after the company said it will delay launching its Down syndrome test because of "employee mishandling" that the company said appeared to affect all studies of the test.*

> SEQureDx is a blood test designed to screen for the genetic disorder Down syndrome, intended to be less intrusive and expensive than amniocentesis and chorionic villus sampling, two techniques commonly used to test for Down. *Early studies of the test were overwhelmingly positive, indicating SEQureDx might be more accurate than other methods, but based on Wednesday's announcement, Sequenom will wait for results of independent clinical trials of the test before launching the test instead of relying on its own research.*

> *Some analysts and investors previously had cautioned that all the completed tests were done by Sequenom itself and not outside researchers.*

> \*     \*     \*

> *Stylli said the independent trials of the test involve about 15,000 women, compared with 858 in the earlier studies. He said the studies are likely to be completed in early 2010. Sequenom is also planning a new trial to "validate" the science behind the test, with results due in the fourth quarter.*

> *The San Diego company had planned to launch the test in June.*

> In heavy morning trading, its stock plunged $11.35, or 76 percent, to $3.56 and briefly set a 52-week low of $3.23. Sequenom shares have traded between $6.10 and $29.14 over the last year.

> *Junaid Husain, an analyst for Navigator Research, downgraded the stock to "Hold" from "Buy" based on the news.*

> *"Disconcertingly, all (Down syndrome) clinical performance data is presumed to be at risk,"* he wrote. *He said the launch of SEQureDx could be delayed by 12 to 18 months.* [Emphasis added.]

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sequenom's securities between June 4, 2008 and April 29, 2009 and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

- 23 -

41.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Sequenom's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sequenom or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Sequenom; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

- 24 -

**UNDISCLOSED ADVERSE FACTS**

46.   The market for Sequenom's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Sequenom's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Sequenom's securities relying upon the integrity of the market price of Sequenom's securities and market information relating to Sequenom, and have been damaged thereby.

47.   During the Class Period, defendants materially misled the investing public, thereby inflating the price of Sequenom's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

48.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Sequenom's business operations and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Sequenom and its business operations and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**LOSS CAUSATION**

49.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

50.     During the Class Period, Plaintiff and the Class purchased securities of Sequenom at artificially inflated prices and were damaged thereby.   The price of Sequenom's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

51.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Sequenom , their control over, and/or receipt and/or modification of Sequenom's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Sequenom, participated in the fraudulent scheme alleged herein.

52.     During the Class Period, the defendants took advantage of the artificially inflated price of the Company's securities by completing financing activities.  For example, on or about June 26, 2008, the Company conducted an SPO. The SPO was a financial success for the Company, as it was able to raise over $85 million by selling 5.5 million shares of stock to investors at a price of $15.50 per share. Then, on November 17, 2008, Sequenom completed its acquisition of the Center for Molecular Medicine, using cash and the Company's artificially inflated stock.

### Applicability of Presumption of Reliance:
### Fraud On The Market Doctrine

53.     At all relevant times, the market for Sequenom's securities was an efficient market for the following reasons, among others:

(a)     Sequenom's securities met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- 26 -

(b)    As a regulated issuer, Sequenom filed periodic public reports with the SEC and the NASDAQ;

(c)    Sequenom regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Sequenom was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

54.    As a result of the foregoing, the market for Sequenom securities promptly digested current information regarding Sequenom from all publicly-available sources and reflected such information in Sequenom's stock price. Under these circumstances, all purchasers of Sequenom securities during the Class Period suffered similar injury through their purchase of Sequenom securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

55.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer

- 27 -

of Sequenom who knew that those statements were false when made.

### FIRST CLAIM
#### Violation of Section 10(b) of
#### The Exchange Act and Rule 10b-5
#### Promulgated Thereunder Against All Defendants

56.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Sequenom securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

58.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Sequenom's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

59.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Sequenom's financial well-being, business relationships, and prospects, as specified herein.

60.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sequenom's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the

1  statements made about Sequenom and its business operations and future prospects in light of the

2  circumstances under which they were made, not misleading, as set forth more particularly herein,

3  and engaged in transactions, practices and a course of business which operated as a fraud and deceit

4  upon the purchasers of Sequenom securities during the Class Period.

5       61.   Each of the Individual Defendants' primary liability, and controlling person liability,

6  arises from the following facts: (i) the Individual Defendants were high-level executives and/or

7  directors at the Company during the Class Period and members of the Company's management team

8  or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as

9  a senior officer and/or director of the Company was privy to and participated in the creation,

10  development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii)

11  each of these defendants enjoyed significant personal contact and familiarity with the other

12  defendants and was advised of, and had access to, other members of the Company's management

13  team, internal reports and other data and information about the Company's finances, operations, and

14  sales at all relevant times; and (iv) each of these defendants was aware of the Company's

15  dissemination of information to the investing public which they knew or recklessly disregarded was

16  materially false and misleading.

17       62.   The defendants had actual knowledge of the misrepresentations and omissions of

18  material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

19  ascertain and to disclose such facts, even though such facts were available to them. Such defendants'

20  material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose

21  and effect of concealing Sequenom's business operations and prospects from the investing public and

22  supporting the artificially inflated price of its securities.  As demonstrated by defendants'

23  overstatements and misstatements of the Company's business operations and prospects throughout

24  the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and

25  omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from

26  taking those steps necessary to discover whether those statements were false or misleading.

27       63.   As a result of the dissemination of the materially false and misleading information

28  and failure to disclose material facts, as set forth above, the market price of Sequenom securities was

1   artificially inflated during the Class Period.  In ignorance of the fact that market prices of

2   Sequenom's securities were artificially inflated, and relying directly or indirectly on the false and

3   misleading statements made by defendants, or upon the integrity of the market in which the

4   securities trades, and/or in the absence of material adverse information that was known to or

5   recklessly disregarded by defendants, but not disclosed in public statements by defendants during the

6   Class Period, Plaintiff and the other members of the Class acquired Sequenom securities during the

7   Class Period at artificially high prices and were damaged thereby.

8        64.    At the time of said misrepresentations and omissions, Plaintiff and other members of

9   the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other

10  members of the Class and the marketplace known the truth regarding the problems that Sequenom

11  was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class

12  would not have purchased or otherwise acquired their Sequenom securities, or, if they had acquired

13  such securities during the Class Period, they would not have done so at the artificially inflated prices

14  which they paid.

15       65.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange

16  Act and Rule 10b-5 promulgated thereunder.

17       66.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the

18  other members of the Class suffered damages in connection with their respective purchases and sales

19  of the Company's securities during the Class Period.

20                              **SECOND CLAIM**
                          Violation of Section 20(a) of
21              **The Exchange Act Against the Individual Defendants**

22       67.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

23  forth herein.

24       68.    The Individual Defendants acted as controlling persons of Sequenom within the

25  meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

26  positions, and their ownership and contractual rights, participation in and/or awareness of the

27  Company's operations and/or intimate knowledge of the false financial statements filed by the

28  Company with the SEC and disseminated to the investing public, the Individual Defendants had the

- 30 -

CLASS ACTION COMPLAINT
Case No. _____

1  power to influence and control and did influence and control, directly or indirectly, the decision-

2  making of the Company, including the content and dissemination of the various statements which

3  Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had

4  unlimited access to copies of the Company's reports, press releases, public filings and other

5  statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were

6  issued and had the ability to prevent the issuance of the statements or cause the statements to be

7  corrected.

8       69.    In particular, each of these defendants had direct and supervisory involvement in the

9  day-to-day operations of the Company and, therefore, is presumed to have had the power to control

10  or influence the particular transactions giving rise to the securities violations as alleged herein, and

11  exercised the same.

12       70.    As set forth above, Sequenom and the Individual Defendants each violated Section

13  10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

14  positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the

15  Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other

16  members of the Class suffered damages in connection with their purchases of the Company's

17  securities during the Class Period.

18      **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

19      (a)    Determining that this action is a proper class action under Rule 23 of the

20      Federal Rules of Civil Procedure;

21      (b)    Awarding compensatory damages in favor of Plaintiff and the other Class

22      members against all defendants, jointly and severally, for all damages

23      sustained as a result of defendants' wrongdoing, in an amount to be proven at

24      trial, including interest thereon;

25      (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred

26      in this action, including counsel fees and expert fees; and

27      (d)    Such other and further relief as the Court may deem just and proper.

28

- 31 -

1

### JURY TRIAL DEMANDED

2        Plaintiff hereby demands a trial by jury.

3   DATED:  May 8, 2009                    Respectfully submitted,

4                                          GERGOSIAN & GRALEWSKI LLP
                                           EDWARD M. GERGOSIAN
5                                          ed@gergosian.com
                                           ROBERT J. GRALEWSKI, JR.
6                                          bob@gergosian.com

7

8                                          _____
                                           EDWARD M. GERGOSIAN

9                                          655 West Broadway, Suite 1410
                                           San Diego, CA  92101
10

11                                         BARROWAY TOPAZ KESSLER
                                             MELTZER & CHECK, LLP
12                                         D. SEAMUS KASKELA
                                           skaskela@btkmc.com
13                                         DAVID M. PROMISLOFF
                                           dpromisloff@btkmc.com
14                                         STEVEN D. RESNICK
                                           sresnick@btkmc.com
15                                         280 King of Prussia Road
                                           Radnor, PA 19087

16                                         *Attorneys for Plaintiff*

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
Case No. _____

## CERTIFICATION

I, Marilyn Patry, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the Complaint, and authorizes its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's purchase and sale transaction(s) in the Sequenom, Inc. (Nasdaq: SQNM) security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
| Common Stock | 264 | (B) | | 2/3/09 | $18.92 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.      Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: _____

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27 day of MAY 2009.

_____
MARILYN PATRY

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| MARILYN PATRY, Individually and On Behalf of All Others Similarly Situated, | SEQUENOM, INC., HARRY STYLLI, PAUL W. HAWRAN, ALLAN T. BOMBARD, CHARLES R. CANTOR and ELIZABETH DRAGON, |

09 MAY -8 PM 12: 33

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Sedgwick County, KS<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   San Diego, CA<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Edward M. Gergosian<br>GERGOSIAN & GRALEWSKI LLP<br>655 West Broadway, Suite 1410<br>San Diego, CA 92101<br>(619) 237-9500 | ATTORNEYS (IF KNOWN)<br><br>'09 CV 1 0 0 0 JM   CAB |

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

- 1 U.S. Government Plaintiff
- **X** 3 Federal Question (U.S. Government Not a Party)
- 2 U.S. Government Defendant
- 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 5 | 6 |

## IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. §§§ 77k, 77o, 78j(b) and 78t(a) – Claims for violations of the federal securities laws.

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 610 Agriculture | 422 Appeal 28 USC 158 | 110 400 State Reappointment |
| 120 Marine | 310 Airplane | 362 Personal Injury-Medical Malpractice | 620 Other Food & Drug | 423 Withdrawal 28 USC 157 | 410 Antitrust |
| 130 Miller Act | 315 Airplane Product Liability | 365 Personal Injury- | 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | 430 Banks and Banking |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | Product Liability | 630 Liquor Laws | 820 Copyrights | 450 Commerce/ICC Rates/etc. |
| 150 Recovery of Overpayment &Enforcement of Judgment | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 640 RR & Truck | 830 Patent | 460 Deportation |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 650 Airline Regs | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| 152 Recovery of Defaulted Student Loans (Excl. Veterans) | 345 Marine Product Liability | 370 Other Fraud | 660 Occupational Safety/Health | **SOCIAL SECURITY** | 810 Selective Service |
| 153 Recovery of Overpayment of Veterans Benefits | 350 Motor Vehicle | 371 Truth in Lending | 690 Other | 861 HIA (13958) | 850 Securities/Commodities Exchange |
| 160 Stockholders Suits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | **LABOR** | 862 Black Lung (923) | 875 Customer Challenge 12 USC |
| 190 Other Contract | 360 Other Personal Injury | 385 Property Damage Product Liability | 710 Fair Labor Standards  Act | 863 DIWC/DIWW (405(g)) | 891 Agricultural Acts |
| 195 Contract Product Liability | | | 720 Labor/Mgmt. Relations | 864 SSID Title XVI | 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 730 Labor/Mgmt. Reporting & Disclosure Act | 865 RSI (405(G)) | 893 Environmental Matters |
| 210 Land Condemnation | 441 Voting | 510 Motions to Vacate Sentence Habeas Corpus | 740 Railway Labor Act | **FEDERAL TAX SUITS** | 894 Energy Allocation Act |
| 220 Foreclosure | 442 Employment | 530 General | 790 Other Labor Litigation | 870 Taxes (U.S. Plaintiff of Defendant) | 900 Appeal of Fee Determination Under Equal Access to Justice |
| 230 Rent Lease & Ejectment | 443 Housing/Accommodations | 535 Death Penalty | 791 Empl Ret. Inc. Security Act | 871 IRS – Third Party 26 USC 7609 | 950 Constitutionality of State |
| 240 Tort to Land | Welfare | 540 Mandamus & Other | | | 890 Other Statutory Actions |
| 245 Tort to Product Liability | Other Civil Rights | 550 Civil Rights | | | |
| 290 All Other Real Property | | 555 Prisoner Conditions | | | |

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

**X** 1 Original Proceeding    2 Removal from State Court    3 Remanded from Appelate Court    4 Reinstated or Reopened    5 Transferred from another district (specify)    6 Multidistrict Litigation    7 Appeal to District Judge from Magistrate Judgment

| VII. REQUESTED IN COMPLAINT: | **X** CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 | DEMAND $ | Check YES only if demanded in complaint:<br>JURY DEMAND: **X** YES   NO |
|---|---|---|---|

VIII. RELATED CASE(S) IF ANY (See Instructions): JUDGE William Q. Hayes          Docket Number 09-cv-00972-WQH-CAB

DATE May 8, 2009          SIGNATURE OF ATTORNEY OF RECORD   *Edward Gergosian*

#594   $350.

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

CR   5/8/09

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS000594
Cashier ID: sramirez
Transaction Date: 05/08/2009
Payer Name: GERGOSIAN AND GRALEWSKI
---------------------------------
CIVIL FILING FEE
 For: PATRY V. SEQUENOM
 Case/Party: D-CAS-3-09-CV-001000-001
 Amount:         $350.00
---------------------------------
CHECK
 Check/Money Order Num: 5978
 Amt Tendered:  $350.00
---------------------------------
Total Due:      $350.00
Total Tendered: $350.00
Change Amt:     $0.00


There will be a fee of $45.00
charged for any returned check.
```